IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| RONALD E. GRAVELY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:18-cv-00139 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Ronald E. Gravely filed suit against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80, claiming personal injury damages caused by the negligence of a postal service employee when the side mirror of Gravely's vehicle and the side mirror of the postal service vehicle collided while the vehicles were traveling in opposite directions on a narrow road.  A bench trial was held wherein the parties stipulated to certain facts and presented evidence.  Because Gravely did not meet his burden of proof regarding negligence, the court finds in favor of the United States.

I.  STANDARD OF REVIEW

Rule 52(a)(1) of the Federal Rules of Civil Procedure requires that the court make specific findings of fact and state conclusions of law separately in any action tried without a jury. Specifically, the trial judge must appraise the testimony and demeanor of witnesses, as well as weigh the evidence and choose, among conflicting inferences and conclusions, those that seem most reasonable.  *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889–90 (4th Cir. 1964).  In this regard, the trial court is in a unique position to evaluate the credibility of witnesses and weigh the evidence accordingly.  *See Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 345

(3d Cir. 2013) (citing *Inwood Labs., Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 855 (1982)). The trial judge has the inherent right to disregard testimony of any witness when satisfied that the witness is not telling the truth or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. *Id*. (citation and internal quotation marks omitted); see *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) (internal quotation omitted) (stating that the factfinder is in a better position to make judgments about the reliability of some forms of evidence, including evaluation of the credibility of witnesses).

A trial court must do more than announce statements of ultimate fact, *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986), but is not required "to make findings on all facts presented or to make detailed evidentiary findings. . . . The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

## II. STIPULATED FACTS, TESTIMONY, AND OTHER EVIDENCE

**A. The Accident**

1. <u>Agreed facts</u>

The parties agreed as follows:

1. On April 12, 2016, Lauren Gammon (then Lauren Bridges) was in training to become a United States Postal Service (USPS) letter carrier based out of Danville, Virginia.

2. Gammon conducted her training in a right-side drive mail truck, commonly known at the USPS as a Long-Life Vehicle (LLV). Richard Bailey, another USPS employee, was a passenger with Gammon and was responsible for training Gammon on how to safely operate the

2

LLV. His objective was to observe, correct, and evaluate Gammon's operation of the LLV. Prior to operating the LLV on public roads, Gammon had successfully completed classroom training as well as a preliminary driving test in the LLV on USPS property in Salem, Virginia.

3. Prior to her training, Gammon had no experience in the right-side drive vehicles and had at the time of the accident less than three hours driving a right-side drive vehicle in the parking lot of the Salem Post Office and one to two hours on a public roadway.

4. Sometime after noon on April 12, 2016, Gammon commenced training in the LLV with Bailey seated to her left in a training position. Gammon was approximately half-way through her on-the-road training when she began driving eastbound on North Mill Road in Salem, Virginia. As she approached (or was on) a narrow bridge, she passed Gravely's truck, travelling westbound, and her left side view mirrors clipped the left side mirror of Gravely's truck.

5. The plaintiff, Ronald Gravely, was travelling westbound on North Mill Road in Salem, Virginia. After he crossed (or was crossing) a narrow bridge at the bottom of the hill, he passed the LLV and his driver's side mirror clipped the LLV's left side mirror.

6. The collision caused the left side mirrors of each vehicle to fold inward. Gravely's exterior side mirror assembly remained intact, but the collision dislodged the mirror from the assembly and pieces struck his left hand and lower side region where he previously had a kidney transplant. Gravely's truck had no other damage. The LLV suffered no damage.

2. Testimony regarding the accident

**Gammon's Testimony**

Gammon was in training on the day of the accident and was driving the LLV with its blinking lights on. She had only driven the LLV on public roads the day of the accident and,

possibly, the day before. She had prior experience driving as a contractor for Duke Power when she read meters for four to five years and drove a F150 truck. She also had experience driving a 16-passenger van on a part-time basis for six to seven years as a recreation assistant. Both vehicles were wider than the LLV. Gammon testified that she recognized the road was narrow, but it did not concern her. She was not simulating delivering mail to mailboxes on that road, and the mailboxes were on the other side of the road. The LLV fits comfortably within a parking space.

As she recalls, the accident happened before she got on the bridge or on the bridge. At trial, she recalled the accident happening right before she got on the bridge, but at her deposition she recalled it being on the bridge. She recalled going across the bridge after the collision, and she recalled an embankment / a drop off to her right. The bridge has guardrails on each side. She told her husband on the day of the accident that it seemed like Gravely was over the line intentionally trying to collide with her, but she did not testify to that at the trial. When deposed, she said she was not aware of anything Gravely could have done to avoid the accident. At trial she said he could have moved over to the right.

After the collision, she crossed the bridge and pulled over into a driveway as instructed by Bailey. While waiting in the LLV, she overheard Gravely state to his son that "this little girl doesn't need to be driving, and she's not going to have a job when I get through with her" and that he would be getting money out of this.

**Bailey's Testimony**

Bailey, riding in the LLV as Gammon's trainer, testified that there is a practice phase and a test phase of the training. They were in the test phase when the accident occurred. They were not simulating mail delivery during the test phase. There was never a time prior to the accident

that the LLV was pulled over on North Mill Road or swerving into the opposite lane. The road is narrow, but two vehicles may pass in opposite directions. At his deposition, he stated that he was not sure that two vehicles could pass on the bridge. He recalls the accident occurring a few yards before the LLV crossed the bridge, and, when deposed, he stated, consistently, that the accident occurred as they were approaching the bridge and the other vehicle was across the bridge. Bailey testified that Gammon did not cross the centerline[1] and neither did the vehicle's mirror. Had she been driving over the center line, he would have observed it in his evaluation of her. Bailey felt that Gravely's vehicle was very close to them, and it seemed that it was on the centerline or thereabout. He admitted, however, that "it's been so long ago." Bailey denied telling Gravely, as Gravely later testified, that he thought Gammon was at fault.

After the accident, he instructed Gammon to pull over in a safe place. He advised Gravely that he would call the police, but, other than that, he did not speak with Gravely. Gammon remained in the LLV.

**Gravely's Testimony**

Gravely, who was a professional truck driver with a CDL for 30 years and familiar with North Mill Road, testified that, as he topped the hill, he saw the mail truck pulling off the side of the road and coming back on to the road. As he got closer to the bridge, he saw the mail truck veering over to the centerline of the road. He went over the bridge, staying to the right as far as he could, given the guardrail. He testified that the accident occurred in the middle of the bridge. When the mirrors collided, according to Gravely, the postal vehicle was across the centerline. He was driving with his window down and his crooked elbow on the ledge. The guts of his mirror hit his left hand, his right side where he has a transplanted kidney, and then dropped to the floor. He testified that he had pain in his left hand and right side – not his abdomen or stomach.

---

[1] When asked, he said he was 98 to 100% sure of this.

He said he had a scrape on his left hand that was bleeding. He stopped when the accident occurred, but the LLV kept going. He then turned around and stopped near the stopped LLV. Bailey, according to Gravely, said "I apologize for her hitting you, she's new," as Bailey came to Gravely's passenger side window after the accident.

Gravely's son arrived before the police. When the officer arrived, he first went to the LLV and then to Gravely. Gravely testified that, as he was holding his hand, he was upset and he told the officer and the Postal Service investigators that he was "sitting here hurt if you want to take pictures of my truck and nobody has asked me am I hurt or not." Despite this, no one asked him if he needed emergency medical help. The officer told him he was not going to charge anyone, and Gravely went home.

**B. Investigation Of The Accident**

The parties agreed that Officer (now Detective) David Ratliff of the Salem Police Department responded to the accident and investigated the collision. Ratliff testified that both vehicles had been moved before he arrived. He did not charge either driver with any traffic offenses. He said that Gammon and Gravely both told him that they did not cross the center line. Bailey also told him that he did not believe that Gammon crossed the center line. Gammon added that Gravely did not cross the center line. Gravely told him that Gammon crossed the center line and that he moved over to the shoulder as far as possible. Gravely noted that the mirror flew into the window and struck his midsection and left arm. He had some pain, but he refused rescue services. Ratliff was under the impression that the accident occurred just before the bridge on the East side – meaning that Gammon, but not Gravely, would have already crossed over the bridge. Detective Ratliff also testified that he thought there was enough room for both cars to pass without hitting each other.

6

Richard Ayers and Jason Convery, both employees of the USPS in Salem, also responded to the scene of the accident to investigate. Based on interviews of the two postal employees in the LLV, they concluded that the LLV had not crossed the center line.

## C. Plaintiff's Injuries And Medical Treatment

When Gravely got home, his finger started to swell up and he had pain in his right side. He was very concerned about his transplanted kidney because he did not want to lose it or go back on dialysis. He went to the emergency room.[2] According to the medical records, he complained of left hand and right flank pain. (USAO 1345, Def.'s Ex. 14). He testified that they started treating his hand and his kidney. They started wrapping his hand and got a splint. Then, they decided they wanted x-rays of the hand and the kidney. They x-rayed his uninjured right hand instead of his injured left hand, which is confirmed by the records (USAO 1144). He said that he did not notice at the time because of his concern with his kidney.[3] He also testified that

---

[2] Gravely did not seek medical attention at the scene of the accident, which occurred sometime after noon on April 12, 2016. The emergency room record indicates an arrival time of 9:35 p.m. on April 12. (USAO 1346, Def.'s Ex. 14.)

[3] The following exchange occurred at trial between Gravely and the Assistant United States Attorney:

> Q  You testified that you went to the emergency room and that they X-rayed your right hand. You're a smart guy, right?
>
> A  That's what it says on the report.
>
> Q  Isn't it true that you are very cautions with your care?
>
> A  With my kidney, yes.
>
> Q  And with your hand and the rest of your body?
>
> A  My hand wasn't my concern at the moment. It was my kidney more so than my hand. I was concerned about both of my kidneys.
>
> Q  But your hand was injured so badly that you are now wearing a brace today.
>
> A  Because I went back to the doctor.
>
> Q  And you were — it was your left hand that you are saying was injured?

they splinted his right finger, but there is no indication of a splint in the medical records. There is also no record of a scrape or abrasion on the left hand. He stated that he was concerned when they attempted to give him an IV with medicine that would harm kidneys, so he asked to go to the Veterans' Administration Hospital (the VA) for treatment. Per Gravely, they agreed. There is no notation about this in the records. He was diagnosed with contusions and discharged. (USAO 1358.)

The United States made much of the fact that the Emergency Room medical records reference a "head on" collision. Rather, the records note the direction of impact as "head on." (USAO 1350). The narrative in the record, however, notes that Gravely told them that he was a restrained driver "when he was side swiped and the mirrow [sic] was smashed and flew into the car striking his abd, also his hand was struck either by the opposing vehchle [sic] or the mirror…." (USAO 1131). The same record notes "mod pain to hand, no frank abd pain." (USAO 1131.) On exam, everything is noted to be nontender (USAO 1133).

Gravely testified he went to the VA that same day. According to the records, however, it was the next day. He called the morning of April 13, 2016, and asked to be evaluated for pain at the transplanted kidney site due to an automobile accident. (USAO 1003.) He arrived about

---

A  That's correct.

Q  Then why would you let them X-ray your right hand?

A  I didn't let them do anything. They took me in the back, they X-rayed my hand, they came back and put a splint on my hand and they sent me home and said it would be better.

Q  And they put a splint . . .

A  Splint on my finger.

Q  On your right finger?

A  And sent me home.

8

4:30 p.m. that day at the VA emergency room. The medical records indicate that he asked for an evaluation, CT scan, and ultrasound to check on his kidney because of the motor vehicle accident. (USAO 998.) The records note tenderness on the transplant kidney and that the left arm injuries had been addressed at Lewis Gale. (USAO 997.) They could not run certain tests and wanted him to stay until the next day, but he did not want to leave his service dog at home. Thus, he checked himself out against medical advice. He told them, "I know my kidneys, and I know they are ok." (USAO 997.) When asked to explain this, he said, "It's called speaking things that be not as though they were."

The next day, he returned to the VA. He testified that he was not concerned about his hand then because the emergency room had treated his hand by wrapping and splinting it. He stated that the emergency room told him he had a contusion or fracture and it would heal itself. He had a CT scan done. While the CT scan showed some conditions that needed to be monitored, it revealed no visceral injury to the kidney and no condition related to the accident. (USAO 205, 989.)

He testified that, about two weeks later in April, he followed up with Dr. Raza (his primary care doctor) because of his hand and his kidney. Additionally, he testified that his finger was swollen and hurting, and his hand was hurting. Dr. Raza's medical records, however, show that he was there to establish care and he "does not have any acute issues." (USAO 1328-1330.) There is no mention of the accident, of hand or finger pain, or of kidney pain. (USAO 1328-1330.) Dr. Raza charted Gravely as "negative" for abdominal pain. (USAO 1328.) Gravely explained the lack of information in the record about his hand by stating that Dr. Raza was *still* looking at the wrong hand (the right hand) because he read the emergency room report that his right hand was x-rayed. Gravely does not recall if he told Dr. Raza that the emergency room

9

doctor had x-rayed the wrong hand. Again, though, there is no record of a hand complaint at all on that day.

In June and July 2016, he did tell his counselor that his stomach had been swollen since the accident and that he had numbness in both hands that he attributed to the accident. While he stated that he was beginning to worry that the accident harmed his transplanted kidney. (USAO 963, 960), he noted that they had not found anything wrong with his kidney.

In August 2016, he was a walk-in in the renal clinic and stated that he had abdominal swelling, which he said was new since the accident, but no diagnosis was noted regarding the kidney. The record does indicate a complaint of hand injury. (USAO 1339.)

Despite the lack of any support in the medical records, Gravely testified that his hand was still hurting on the day of the trial – over three years post-accident. He was also wearing a brace on his hand at trial that he had been wearing for six weeks. He got the brace when he went back to Dr. Raza after he found out he was going to court. He showed the court a scar on his hand which he attributes to the accident, as well as a discolored area at the kidney site. No medical records mention either.

### III. FINDINGS OF FACT

Without restating them, the court adopts the facts agreed to by the parties noted above. Additionally, the court adopts the facts as testified to by the officer and the Postal Service investigators and to what their investigations revealed as noted above, but it does not rely on their conclusions in determining the facts of this case.

The court notes that, given the passage of time, no witness had very good recall of the accident. But, the court finds Bailey's testimony to be the most consistent and most credible.

Gammon's testimony was inconsistent at times, and Gravely's testimony was often contrary to contemporaneous records made by those with no stake in the litigation.

Gammon had some inconsistencies in her testimony. At her deposition, Gammon stated that she was not aware of anything that Gravely could have done to avoid the accident. At trial, however, Gammon testified that she thought Gravely could have moved more to his right as the vehicles approached each other. She explained this change in testimony noting that, after her deposition, she refreshed her recollection by speaking to her husband, the first person she spoke to right after the accident. Gammons' husband reminded her that she told him after the accident that it seemed like Gravely was trying to collide with her. However, she did not say he was trying to collide with her at trial. Thus, the court does not rely on Gammon's testimony regarding the disputed facts of the accident.

Gravely's testimony was replete with misperceptions, especially regarding his alleged injuries, and with exaggerations. Gravely's testimony indicates that he was carefully watching the LLV for some period of time before the accident. He testified that, as he topped the hill, he saw the mail truck pulling off the side of the road and coming back on to the road. It is clear to the court, however, that the LLV was not doing so. As Gammon and Bailey testified, they were not simulating putting mail in mailboxes, and the mailboxes were not even on that side of the road. Then, as Gravely got closer to the bridge, he saw the mail truck veering over to the centerline of the road. Despite observing this, he proceeded over the bridge. He stated he went over the bridge, staying to the right as far as he could, given the guardrail. He testified that the accident occurred in the middle of the bridge. When the mirrors collided, according to Gravely, the postal vehicle was across the centerline. Also, Gravely claimed that the officer never asked him about needing emergency medical services, but this is contradicted by the police officer.

Gravely's testimony about his injuries and medical treatment strains credulity, and he is not a reliable historian of his own medical situation. He was supposedly so concerned about his kidney that he failed to notice or point out to the doctors that they were x-raying and treating the wrong hand – even though the injured left hand supposedly had a scrape significant enough to leave a scar. Then, despite this concern, he left the VA emergency room the next day against medical advice stating that he knows his kidneys and they are okay. When he returned, he made no mention of his hand and no accident-related issues were found with his kidney. In fact, later in the month of the accident when he was establishing care with Dr. Raza, he made no mention of the accident or any injuries. Then, only when he knew he was going back to court soon and years later, he mentioned his hand and got a brace to wear.

Because Gravely has exaggerated and testified to facts that are not consistent with contemporaneous records of neutral persons, the court does not rely on the testimony of Gravely regarding the disputed facts of the accident.

The court finds Bailey to be a credible witness. He was administering the driving test to Gammon. Thus, had she been driving erratically by pulling off the side of the road and going over the center line while approaching the bridge, he would have noticed. They were not simulating mail delivery during the test phase, and there was never a time prior to the accident that the LLV was pulled over on North Mill Road or swerving into the opposite lane. Consistent with his deposition testimony and Gammon's testimony, he recalls the accident occurring a few yards before the LLV crossed the bridge. Bailey testified that Gammon did not cross the centerline and neither did the vehicle's mirror. Bailey felt that Gravely's vehicle was very close to them, and it seemed that it was on the centerline or thereabout. When discussing the location

of Gravely's vehicle in relation to the centerline, he candidly admitted that "it's been so long ago."

Given these credibility determinations, the court finds that:

1. The LLV was not pulling off to the side of the road or going over the centerline before it approached the bridge or as it approached the bridge.

2. The accident occurred several yards before the LLV got to the bridge.

3. The LLV and its mirrors did not cross the center yellow line at the time of the accident.

## IV.  CONCLUSIONS OF LAW

This case is governed by the Federal Tort Claims Act ("FTCA"). The FTCA is a partial waiver of the sovereign immunity of the United States, and the FTCA vests federal district courts with exclusive jurisdiction over civil actions: (1) against the United States, (2) for money damages, (3) for injury or loss of property, (4) caused by the negligent or wrongful act or omission of any employee of the Government, (5) while acting within the scope of his office or employment, (6) under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *See* 28 U.S.C. § 1346(b). In an action under the FTCA, courts apply state substantive negligence law. *See FDIC v. Meyer*, 510 U.S. 471, 478 (1994) ("[W]e have consistently held that § 1346(b)'s reference to 'law of the place' means the law of the State—the source of substantive liability under the FTCA."); *see also Williams v. United States,* 242 F.3d 169, 173 (4th Cir. 2001).

Under Virginia law, negligence is defined as "the failure to exercise 'that degree of care which an ordinarily prudent person would exercise under the same or similar circumstances to

13

avoid injury to another.'" *Gossett v. Jackson*, 457 S.E.2d 97, 100 (Va. 1995) (citing *Griffin v. Shively,* 315 S.E.2d 210, 212–13 (Va. 1984)). Negligence, however, cannot be presumed from the mere happening of an accident. *See Jordan v. Jordan*, 257 S.E.2d 761, 762 (Va. 1979). Under Virginia law, the elements of a negligence claims are the existence of a legal duty, breach of that duty, and proximate causation which results in injury. *Delk v. Columbia/HCA Healthcare Corp.,* 523 S.E.2d 826, 830 (Va. 2000). In other words, "there must be a legal duty, a breach thereof, and a consequent injury which could have been reasonably foreseen by the exercise of reasonable care and prudence." *Jordan*, 257 S.E.2d at 762. The plaintiff bears the burden to show these elements by a preponderance of the evidence. *Sides v. Richard Mach. Works, Inc.*, 406 F.2d 445, 446 (4th Cir. 1969).

At issue in this case is whether any part of the LLV driven by Gammon was over the center yellow line in the road when the vehicles collided on April 12, 2016. If the LLV crossed over the center yellow line and collided with Gravely's vehicle, then Gravely would be entitled to damages, if proven, that were caused by the negligence of Gammon, an employee of the United States Postal Service.[4] Gravely bears the burden of proof on this issue.

In sum, the only evidence to support Gravely's position is his own testimony that he moved as far to the right as possible and that the postal vehicle crossed the center line. The court, however, does not rely upon this testimony because of Gravely's lack of credibility. Additionally, this evidence is countered by Bailey's testimony, which the court finds to be credible. Thus, Gravely has failed to meet his burden of proof and has not proven, by a preponderance of the evidence, that Gammon was negligent. Because Gravely failed to prove negligence on the part of Gammon, the court need not address Gravely's injuries or damages, and judgment will be entered in favor of the United States.

---

[4] Unless he had been contributorily negligent.

## V.  MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS

The trial began with argument on defendant's motion to exclude Dr. Rogers (Dkt. No. 60), plaintiff's expert, whose trial testimony had been taken by deposition.  The United States argued that the testimony was unreliable because Dr. Rogers had not been provided with, or was provided with only one of, Dr. Raza's, plaintiff's primary care provider, records.  Gravely argued that it was not for the United States to determine what medical records were appropriate to share with the expert.  The court took the motion under advisement pending the presentation of evidence because it lacked sufficient information about the medical records to make a ruling at that time.  Thereafter, when discussing exhibits, plaintiff's counsel asked to leave the Dr. Rogers' deposition transcript marked for identification only and not admitted.  Thus, it appears that it was withdrawn, rendering the motion moot.  To the extent it was not withdrawn, it was not offered into evidence, and the motion is moot.  In any event, given the court's decision regarding liability, his testimony is irrelevant.

## VI.  CONCLUSION

Based on the foregoing, the court concludes that Gravely has not met his burden of proving by a preponderance of evidence that the accident was caused by Gammon's negligence.  The court will enter judgment in favor of the United States and will also issue an order denying as moot the government's motion to exclude plaintiff's expert witness, Dr. Mark Rogers.

Entered: June 1, 2020.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge